Filed 5/5/21  Marriage of Manickam and Halagatti CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re the Marriage of NAGENDRA MANICKAM and HEMA P. HALAGATTI. | |
| | D078617 |
| NAGENDRA MANICKAM, | |
| Appellant, | (Super. Ct. No. 2014-6-FL-013489) |
| v. | |
| HEMA P. HALAGATTI, | |
| Respondent. | |


APPEAL from an order of the Superior Court of Santa Clara County, James E. Towery, Judge.  Affirmed.

Brian Beckwith for Appellant.

Law Offices of John H. Perrott and John Henry Perrott for Respondent.

In this marital dissolution action, Nagendra Manickam appeals an order finding that he used community funds for non-community purposes and directing him to immediately pay approximately $265,000 to his former wife Hema P. Halagatti.  Manickam contends the trial court erred by (1) staying all issues related to certain real property located in India, (2) denying his

continuance request during trial, and (3) pressuring him to complete his presentation of evidence. We conclude Manickam has not shown reversible error and affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

In 2014, Manickam filed an uncontested petition for dissolution of his nine-year marriage to Halagatti. The petition requested that the court order joint legal custody of their daughter, with physical custody to Halagatti. The petition requested that child support be "reserved," with some specific provisions regarding payment of health insurance and expenses for daycare and education. The petition also requested that the court award no spousal support and terminate its jurisdiction to order such support.

Manickam filed a declaration identifying the family home in Santa Clara, California as the sole community property asset. He proposed that it be awarded to himself in full. He did not request confirmation of his interest in any separate property or debts.

Halagatti filed a general appearance. She agreed to entry of judgment as requested. Neither Manickam nor Halagatti were represented by counsel.

At a hearing, the trial court expressed concern that the agreement was one-sided and unfair to Halagatti. Under questioning, Halagatti appeared unaware of her rights under California law. The court declined to approve the agreement and directed Halagatti to consult a private attorney. It set a further hearing six weeks later.

The transcript of the further hearing is not in the record. The court, however, entered judgment as requested by Manickam and agreed by Halagatti.

Three months later, Halagatti (now represented by counsel) filed a request for an order setting aside the judgment, awarding spousal and child

2

support, and reconsidering the division of community property. Halagatti stated she had been physically and emotionally abused by Manickam and coerced into agreeing to the judgment. She maintained that Manickam's financial disclosures were false and incomplete because, among other things, they omitted various financial accounts, certain real property in India, and a movie production company owned by Manickam.

Manickam (now represented by counsel as well) opposed the request. He denied coercing Halagatti into agreeing to the judgment. He maintained that Halagatti "received" valuable real property in India, worth more than 50 percent of the couple's assets, as part of the dissolution. He explained that he transferred between $120,000 and $150,000 to India to purchase three properties in Halagatti's name. He stated, "as a part of [the] Asset division, the above properties were given to [Halagatti]." He acknowledged working on various movies but denied owning a movie production company or receiving any compensation for that activity.

After engaging in mediation, Manickam and Halagatti agreed to an order vacating the judgment. Their marriage remained dissolved. The court awarded child support to Halagatti and set a date for the exchange of financial information and reimbursement claims. The parties agreed to engage in settlement discussions.

Several months later, Halagatti filed a request for an order liquidating the couple's real property assets. She identified the Santa Clara house, as well as four properties in India, for liquidation. Two of the Indian properties were titled in Manickam's name, and two were in Halagatti's name. Halagatti alleged that one of the properties in Manickam's name was by far the most valuable. Halagatti noted that Manickam had identified as community property three other Indian properties, at least one of which was

held in the name of Halagatti's parents. Halagatti disputed that the community had any interest in those three additional properties.

In his opposition, Manickam argued that Halagatti was in "possession" of the two Indian properties identified by Halagatti as being titled in her name. He also argued that Halagatti was in "possession" of the three additional properties, and he stated that he was surprised to learn that one was titled in the name of Halagatti's mother. Manickam identified the Santa Clara house and the two Indian properties titled in his name as properties in his possession. He contended that his properties were worth less than Halagatti's properties (taking into account the three additional properties omitted from Halagatti's liquidation request), so in his view liquidation would result in a large loss to him.

It appears the court did not rule on the liquidation request. Instead, the parties entered into a stipulation resolving other matters and setting a trial date on various issues including credits and reimbursement. The parties estimated one full day for trial.

Manickam applied ex parte for a three-day trial, based on the complexity of the case and the number of anticipated witnesses, including the parties, their accounting experts, and an expert on Indian law. The court denied the request. It also vacated the trial date, ordered the parties' accountants to meet and confer, and referred the matter to a settlement officer.

At a settlement conference, the parties stipulated to an order directing Manickam to cooperate with his accountant before and during an upcoming international trip. They also set a further settlement conference.

In advance of a status conference, the parties described their inability to resolve the outstanding financial issues. Each party blamed the other for

4

various difficulties and delays. At the conference, the court ordered the accountants to meet and confer in person to determine "what needs to be done on [the] case to be trial ready." The court set a further status conference, a mandatory settlement conference, and a two-day trial. The court directed Halagatti's counsel to prepare a formal order, but a signed order does not appear in the record.[1]

Five months later, Manickam requested an order granting him exclusive control of the three additional properties in India whose status was disputed. He reiterated his claim that he had transferred money to Halagatti's family in India in order to buy property. He and Halagatti had "jointly invested" in the three properties using community property funds. He argued that he should be given control of the properties because Halagatti had disclaimed any interest in them and "has left the community assets by itself [*sic*]," so that Manickam was the managing spouse. He also argued, "Since [Halagatti] doesn't have any claims, we can remove these properties as community properties and [Manickam] can handle [them] separately as [the] property exists in India."

Halagatti opposed the request. She noted that the court had denied a prior request by Manickam, apparently on similar grounds, to join Halagatti's mother as a party in the dissolution proceeding. She also noted that Manickam "has already filed a Request for this same Relief in India, and the matter is now pending before the Court in India." She attached an online docket purporting to show the filing of an Indian lawsuit by Manickam

---

[1] When Halagatti's accountant attempted to schedule a meeting, Manickam's accountant responded that he had suspended work on the case because Manickam had "an outstanding balance and is not able to pay us." Halagatti applied for an order to show cause for contempt against Manickam, which the court issued, but she subsequently took the matter off calendar.

5

against Halagatti and two family members. She requested that the court take judicial notice of documents from the Indian lawsuit, including a statement of Manickam's claims. In a supporting memorandum, Halagatti argued that the documents were relevant because they showed that Manickam had sought relief on the same issues in India. Halagatti argued that principles of comity counseled against adjudicating the same issues in California. She also argued that California was an inconvenient forum in which to hear these issues. Halagatti maintained that one of the disputed properties was owned by her mother and the remaining two properties were not owned by any family member. She contended that Manickam had not been "sufficiently honest and forthcoming" with the court because he did not disclose the lawsuit in his request.[2]

At the hearing on Manickam's request, the court began by summarizing the history of the proceedings. It noted that the case began with a "vastly overreaching" marital settlement agreement that it reluctantly approved only after compelling Halagatti to obtain independent legal advice. Halagatti then moved to set aside the judgment, which was eventually granted by stipulation, and the case started anew. The court noted it had set a trial on all remaining financial issues and was eager for the litigation to come to an end.

During the hearing, Manickam's counsel acknowledged that the Indian litigation covered some of the same properties. He asserted that the Indian courts had "parallel jurisdiction." He explained, "And those parties, they live in India, the property is in India, the actual land, and the transaction

---

[2]     Manickam likewise did not include Halagatti's opposition or her request for judicial notice in his appellant's appendix filed in this court. Halagatti included them for the first time in her respondent's appendix.

6

happened in India. That's the reason the Indian case has to be there. [¶] The U.S. court, they don't have jurisdiction over the Indian properties. They do have jurisdiction over the parties, but they cannot order . . . the sale of the properties in India. That's the reason there was a requirement to—to file a lawsuit in India as per the advice of the Indian lawyer."

The court agreed that it "clear[ly]" did not have jurisdiction over the properties in India. It went on, "But it's not clear to me that I have the right to make findings regarding [the] community property interest in properties that are not in California. [¶] What I am inclined to do is . . . limit the property issues in this litigation to the California property that is in dispute." Manickam's counsel responded, "I'm okay with that, Your Honor." Later, the court explained that it would "leave to the Indian courts all issues related to the Indian property. That includes reimbursement claims related to the Indian property."

Halagatti and her counsel expressed concern about the four Indian properties that were undisputedly community property. The two properties in Manickam's name were worth substantially more than the two properties in Halagatti's name. Manickam, speaking directly to the court, appeared uncertain about the implications of the court's order and urged the court to award control of the three disputed properties to him.

The court was unpersuaded. It stayed the action as to any claims regarding ownership, reimbursement, or credits related to any of the Indian properties. It explained, "[Any] party who wants to activate that issue and have me deal with them needs to bring it to the Court with proper notice and with legal authority so we can assist the Court in figuring out what to do." The court's orders are reflected in its minutes. The court directed

7

Manickam's counsel to prepare a formal order, but again a signed order does not appear in the record.

In advance of trial, the parties were able to settle a number of issues. In a minute order, the court stated, "The remaining issues for trial should only take [one] day."[3]

Manickam, now representing himself, filed a brief in advance of trial. He identified the following issues as stayed by the court: "Ownership, Claims and [Reimbursements] regarding all the Indian properties connected to this case are stayed for now. [Halagatti] only has claims or interest on four (4) properties mentioned in her [disclosure], whereas [Manickam] has claims for additional three (3) properties purchased through community funds." (Bold omitted.) He listed two witnesses, Halagatti and himself. His accounting expert and the previously-identified expert on Indian law were not listed. Manickam also identified a number of issues for trial. As relevant here, Manickam disputed Halagatti's contention that he had improperly transferred money for purposes that did not benefit the community. He argued that the funds were used for community purposes, including property purchases in India. Attached to Manickam's trial brief were approximately 800 pages of documents.

The first witness at trial was Halagatti's accounting expert. He had reviewed the couple's financial records and identified transactions whose purpose was unexplained. The unexplained transactions fell into three categories: (1) transfers related to Ladoo Cinema House, a movie production company; (2) other domestic transfers within the United States; and (3) other

_____

3    Manickam did not include this minute order in his appellant's appendix. It too was included for the first time in Halagatti's respondent's appendix.

8

foreign transfers to India. The unexplained transactions totaled $530,488. During discovery, Halagatti's accountant received documents from Manickam purporting to explain at least some of the transactions. The accountant reviewed the documents and, to the extent he or Halagatti found the explanation credible, those transactions are not part of the total. He spent a total of 75 to 100 hours working on the case.

In his cross-examination, Manickam (still representing himself) asked Halagatti's accountant whether he had received documentation and analysis from Manickam's prior accounting expert. Halagatti's accountant acknowledged he had received those materials and, to the extent they were persuasive, he had incorporated them into his conclusions. Manickam attempted to introduce documents into evidence, but the court sustained Halagatti's objection to them because they had not been provided at least five days before trial. Manickam asked whether any of the remaining unexplained transfers had been used for property purchases in India, and the accountant said no. The accountant had already removed certain transactions related to Indian property purchases that had been identified and documented adequately.

After the accountant's testimony, the court asked Manickam for a time estimate for his testimony. He responded, "Five minutes." Halagatti's counsel estimated 45 minutes for his cross-examination of Manickam and 30 minutes for Halagatti's direct testimony. The court took a 15-minute break. It was mid-morning.

Manickam began his testimony by identifying a number of documents that had not been previously marked. The court commented that Manickam should have marked the documents earlier and was wasting time. Reviewing the documents, Halagatti's counsel noted that the parties had generally

9

stipulated to the admissibility of the couple's bank statements. (The stipulation itself is not part of the record.) The court admitted some of Manickam's documents pursuant to the stipulation. It sustained Halagatti's objections to other documents on various grounds, including that they were not the couple's bank statements or that they were not timely provided to Halagatti's counsel. Manickam discussed still other documents but did not offer them into evidence.[4]

Regarding Ladoo Cinema House, Manickam testified that it had loaned him money to pay for Halagatti's educational expenses. He produced bank statements purporting to show incoming funds from Ladoo, but under questioning by the court he admitted there was no promissory note or other formal documentation of the loan.

Manickam also testified that he transferred approximately $190,000 to Halagatti's parents for the purchase of the three disputed Indian properties. This amount was not reflected in Halagatti's accountant's report. Other allegedly unexplained transfers were for the couple's trips to India and property taxes in India. Manickam criticized Halagatti's accountant for not acknowledging the documentation he had provided. Manickam concluded his direct testimony by requesting that "all CPA [*sic*] has to be reworked. I can go hire another CPA, but it has to be reworked."

On cross-examination, Manickam acknowledged the court's stay on claims and reimbursements related to the Indian properties. He contended, however, that any funds for such properties should be removed from the list

---

[4]    In some cases, Manickam attempted to introduce large compilations that included bank statements as well as many other types of documents. The court declined to go page-by-page through the compilations to determine what might be admissible or not.

10

of allegedly unexplained transfers. He argued that Halagatti's accountant had deducted funds for one property in India but not others. Manickam also testified about other topics, such as his own reimbursement claims for money spent on Halagatti's family, his separate property claims based on money Manickam brought into the marriage, income allegedly earned by Manickam for other cinema projects, and the mechanics of the couple's bank accounts.

During Manickam's redirect testimony, Halagatti's counsel objected to certain documents as hearsay and as irrelevant based on the court's stay order. The court confirmed its stay, explaining that it "was not going to make any orders regarding the [Indian] property unless and until somebody provided me with authority as to why this Court should do it, and the Court's ability to do it, when the property is located in India and subject to [Indian] litigation." It concluded, "Nobody has provided me with that authority. Nobody has requested a hearing on this. The [Indian] property is not at issue today." The court went on, "And it is a reserved issue. It's reserved to the [Indian] courts until I make a different decision. So any documents regarding the purchase of property are not relevant to today's hearing."

Manickam argued that he was attempting to dispute Halagatti's identification of certain transfers as unexplained transactions. He stated, "All the money is—has been given to Indian property and everything is listed here. So [I] think from a community perspective we're doing double calculations." The court responded that it was crediting the testimony of Halagatti's accountant. It explained, "That testimony is that he was provided certain documents, including documents related to the Indian property and if he was satisfied that the financial transactions, the deposits or withdrawals, were related to the Indian property, he excluded it from his calculations."

11

The court noted that those calculations had not been challenged by opposing expert testimony.

Manickam attempted to introduce other documents related to various Indian properties, but the court sustained Halagatti's objections. It explained that any contribution or reimbursement claims related to the Indian property could be litigated in the Indian courts. After further testimony about a retirement fund loan, the court asked Manickam whether he had any additional evidence. Manickam said he did not but then referenced a few other documents. The court asked, "Well, why did you say a moment ago that you were done? It sounds like you're not done. Do you want to present more evidence or are you done?" Manickam responded, "I'm done, sir." It was early afternoon.

Halagatti testified next. She went over various financial disclosures Manickam had made during the dissolution proceedings. As relevant here, she testified that she did not consent to the various transfers her accountant had identified as unexplained. Manickam controlled their finances during marriage, and Halagatti was not aware of what Manickam was doing. She reviewed the documentation Manickam provided to her accountant, and they removed any transactions for which credible explanations had been provided. On cross-examination, she stood by her accountant's conclusions.

At the conclusion of the hearing, the court asked each party what relief they sought. Halagatti's counsel responded that she sought an order that she was owed $265,244, which represented "half of the community funds that were transferred without any explanation." Manickam responded, "I would like to ask the Court to redo the CPA so that proper analysis has been done again. Because there are a lot of statements which has never been looked into. It's not about money, but it has to be done in a proper way so that both

parties are beneficial." He went on, "This is the only order which can be beneficial to both [of] us so that both of them divide the assets equally."

The court began its ruling by recounting again the history of the proceedings. It noted that the couple's original marital settlement agreement was "entirely one-sided in [the] husband's favor." It explained, "[M]y perception of this case at the very beginning was that the petitioner, Mr. Manickam, had a relationship with the respondent [Halagatti] in which he was, to put it mildly, attempting to be controlling regarding financial issues. [¶] Coming full circle to this hearing today, the Court again finds, in essence, the same behavior. [¶] The Court does find the respondent's testimony to be credible, that during the marriage she did not have control over the finances. The husband had control over the finances."

The court stated that "the only issue that is being tried today are the breach of fiduciary duty/reimbursement claims related to [Halagatti's] contention that [Manickam] transferred money out of community property accounts and used for purposes that did not benefit the community." The parties had resolved the issues of spousal support, child support, and collateral claims by separate stipulation.

The court recognized that issues regarding the Indian properties were still outstanding. It stated, "I understand that there's litigation in the Indian courts regarding those parcels of property, which strikes me as appropriate. And the parties are going to have to resolve all matters regarding the Indian properties, including reimbursement claims that either party has related to those Indian properties. The parties are going to have to resolve those in the courts in India. [¶] Unless and until the parties come back to this Court and provide this Court with authority . . . that [it] is appropriate for this Court to

13

deal with [it]. My instinct is it is not appropriate for this Court to deal with it."

The court declined Manickam's invitation to "have a redo of the CPA activity." It noted that Manickam already had an opportunity to engage in that process, and he chose to voluntarily discharge his accountant. Halagatti's accountant therefore finalized his report and presented it to the court.

On the merits, the court explained that it "has to balance the evidence that has been produced on both sides on this issue." Halagatti had presented the testimony of her accountant, who "addressed this issue in detail." Manickam had offered his testimony and "purported documents" that disagreed with the conclusions of Halagatti's accountant. The court found the testimony of Halagatti's accountant credible and persuasive. Manickam's testimony, especially on the issue of Ladoo Cinema House, was not corroborated and not credible. It therefore ordered Manickam to pay Halagatti one-half of the amount of the unexplained transfers, or $265,244. It was payable immediately, with 10 percent interest beginning on the date of the hearing.

The court's ruling was memorialized in a formal order after the hearing. Manickam appeals.

DISCUSSION

I

*Appealability*

The parties dispute whether the court's order is appealable. " 'The existence of an appealable judgment [or order] is a jurisdictional prerequisite to an appeal.' " (*In re Marriage of Grimes & Mou* (2020) 45 Cal.App.5th 406, 418 (*Grimes & Mou*); accord, *Griset v. Fair Political Practices Com.* (2001)

14

25 Cal.4th 688, 696.) Manickam contends the court's order is appealable under the collateral order doctrine. We agree.

" 'California is governed by the "one final judgment" rule which provides "interlocutory or interim orders are not appealable, but are only 'reviewable on appeal' from the final judgment." [Citation] The rule was designed to prevent piecemeal dispositions and costly multiple appeals which burden the court and impede the judicial process.' [Citation.] An 'exception to the "one final judgment" rule codified in Code of Civil Procedure section 904.1 is the so-called collateral order doctrine. Where the trial court's ruling on a collateral issue "is substantially the same as a final judgment in an independent proceeding" [citation], in that it leaves the court no further action to take on "a matter which . . . is severable from the general subject of the litigation" [citation], an appeal will lie from that collateral order even though other matters in the case remain to be determined.' " (*Grimes & Mou*, *supra*, 45 Cal.App.5th at p. 418; accord, *In re Marriage of Skelley* (1976) 18 Cal.3d 365, 368.)

"To qualify as appealable, the interlocutory order must be a final determination of a matter that is collateral—i.e., distinct and severable— from the general subject of the litigation. [Citations.] The order is deemed final if further judicial action is not required on the matters dealt with by the order. [Citation.] The order is not 'collateral' if it is a 'necessary step' to the determination of the issue in the case. [Citation.] 'The majority view is that an appealable "collateral" judgment or order must direct the *payment of money or performance of an act*.' " (*Koshak v. Malek* (2011) 200 Cal.App.4th 1540, 1545 (*Koshak*).) "A court will look to the substance of an order or judgment rather than its chronology or form. Even if it is technically interlocutory, an order dispositive of the rights of the parties in relation to a

15

collateral matter, or directing payment of money or performance of an act, may be subject to direct appeal." (*In re Marriage of Eben-King & King* (2000) 80 Cal.App.4th 92, 115-116.)

For example, in *Koshak*, a court found a civil defendant guilty of contempt for violating a receivership order and ordered him to pay $1.7 million in restitution to the receivership. (*Koshak*, *supra*, 200 Cal.App.4th at pp. 1543-1544.) The reviewing court held that the order was appealable under the collateral order doctrine. (*Id*. at p. 1546.) As relevant here, the court rejected the argument that the order was insufficiently final because the defendant could regain some or all of the restitution amount after further litigation on the merits. It explained, "Although the trial court left open the possibility that the receiver might in the future return some or all of the restitution amount, [the defendant] was nevertheless subject to a final order of restitution to be paid to the receiver within a month. That he might recover monies after litigating the respective rights and remedies of the parties to the underlying litigation does not suggest a lack of finality of the restitution order." (*Ibid*.)

The court's order here is likewise appealable under the collateral order doctrine. It directed the immediate payment of money. Its subject matter, the reimbursement rights of the parties, was distinct and severable from the remainder of the litigation. Its distinctiveness is shown by the court's order directing Manickam to make the reimbursement payment immediately. Whatever issues remained in the litigation, the court did not anticipate they would affect the payment obligation or its amount. For the same reason, the order was sufficiently final. No further judicial action was contemplated. Although the court left open the possibility that the parties could raise matters related to the Indian properties sometime in the future, that

16

possibility does not substantially undermine the finality of the order. A family court always retains jurisdiction to adjudicate future disputes over omitted or unadjudicated community property. (See Fam. Code, § 2556.)[5] The court's order was not a mere precursor to a future order; it was the court's resolution of the reimbursement issue. As such, like in *Koshak*, the court's order was appealable under the collateral order doctrine. In light of our conclusion, we need not consider whether the order was appealable for any other reason.

## II

### *Standards of Appellate Briefing and Review*

" 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*).) "To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. [Citations.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' " (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) This requirement applies to legal authority and factual matters in the record. "It is not the duty of a reviewing court to search the record for evidence on a point raised by a party whose brief makes no reference to the pages where

---

[5] Subsequent undesignated statutory references are to the Family Code.

the evidence can be found." (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1011.)

"This burden requires more than a mere assertion that the judgment is wrong. 'Issues do not have a life of their own: If they are not raised or supported by argument or citation to authority, [they are] . . . waived.' [Citation.] It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness. When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 (*Benach*).)

Even where an appellant cites general legal principles in support of certain arguments, these principles do not in and of themselves demonstrate error. "Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review. The court is not required to make an independent, unassisted study of the record in search of error. The point is treated as waived and we pass it without further consideration." (*Dept. of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078.) " 'We are not bound to develop appellants' arguments for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived.' " (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)

Much of Manickam's briefing does not satisfy these minimum standards. His opening brief, for example, lists six legal issues that will presumably be raised, but several are omitted from the legal discussion that follows. The legal discussion itself contains only one citation to the record. And, although the discussion references a number of legal principles, it

18

largely fails to apply the law to the record here.  Under these circumstances, we conclude that many of Manickam's contentions are forfeited by his failure to adequately brief them.  We address his contentions in more detail, to the extent warranted, in the following parts.

## III

### *Stay on Issues Related to the Indian Properties*

Manickam's primary argument on appeal is that the court erred by staying all issues related to the couple's real property in India.  Manickam acknowledges that we review the court's decision to stay these issues for abuse of discretion.  (See *San Francisco Unified School Dist. ex rel. Contreras v. First Student, Inc.* (2013) 213 Cal.App.4th 1212, 1228.)

" 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.' [Citations.]  'The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ."  Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.  [Citation.] . . . [¶]  The legal principles that govern the subject of discretionary action vary greatly with context.  [Citation.]  They are derived from the common law or statutes under which discretion is conferred.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)  " 'The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' " (*Denham*, *supra*, 2 Cal.3d at p. 566.)

19

As an initial matter, we agree with Manickam that the trial court had the power to determine the couple's separate and community property interests in the Indian properties, notwithstanding their location. All property, wherever situated, may be community property under California law. (See § 760.) Although a California court cannot directly affect title to non-California property, it has the power to determine the community's interest in such property and divide it as part of the marital dissolution proceedings. (See *In re Marriage of Fink* (1979) 25 Cal.3d 877, 883-884 (*Fink*) [out-of-state property]; *In re Marriage of Ben-Yehoshua* (1979) 91 Cal.App.3d 259, 269 (*Ben-Yehoshua*) [foreign property].)

"It is recognized that California cannot enter a decree directly affecting title or interest in real property outside its borders. [Citation.] It may, however, establish and declare the interests in such property and enter orders in aid of such declaration requiring the parties to execute conveyances in compliance therewith." (*Ben-Yehoshua, supra*, 91 Cal.App.3d at p. 269.)

The division of non-California property often presents practical difficulties. Section 2660 provides guidance to trial courts in this situation. (See *Fink, supra*, 25 Cal.3d at pp. 883-884.) It instructs the trial court, if possible, to "divide the community property and quasi-community property as provided for in this division in such a manner that it is not necessary to change the nature of the interests held in the real property situated in the other state." (§ 2660, subd. (a).) If such a division is not possible, the court may "[r]equire the parties to execute conveyances or take other actions with respect to the real property situated in the other state as are necessary" or "[a]ward to the party who would have been benefited by the conveyances or other actions the money value of the interest in the property that the party would have received if the conveyances had been executed or other actions

20

taken." (§ 2660, subd. (b)(1)-(2).) "[This section] has as its aim the convenience of the parties and avoidance of the necessity for orders which are cumbersome to enforce." (*Fink*, at p. 884.)

Contrary to Manickam's suggestion, however, the court did not simply disclaim jurisdiction over any potential community interest in properties in India. It stayed or reserved consideration of the Indian properties pending the outcome of the parties' litigation in India, without prejudice to any party's ability to raise the issue in the future. It therefore did not violate its duty to decide all of the issues in the dissolution proceeding. (Cf. *Turesky v. Superior Court of Los Angeles County* (1950) 97 Cal.App.2d 838, 839.)

The context of the court's stay order is instructive. It arose because Manickam requested an order that he be given control over three Indian properties that he contended were community property but Halagatti contended were owned by third parties. In response, Halagatti provided evidence of pending litigation in India over the same properties. The Indian litigation included third parties that were not part of the California proceeding. Halagatti argued that California was an inconvenient forum in which to hear issues related to the control of the Indian property. She also argued that the California court should defer, under principles of comity, to the Indian courts. After a hearing, the court denied Manickam's request for control and imposed a stay on any claims regarding ownership, reimbursement, or credits related to any of the Indian properties. The stay therefore arose from Manickam's effort to draw the California court into a dispute over control, not merely division, of the Indian properties. And Manickam did not subsequently seek to lift the stay or offer any legal argument or authority why it was unwarranted.

21

Manickam argues that there was "no clear jurisdictional basis" for the trial court to order the stay. He contends that section 2660 does not authorize a stay, and he criticizes the court for failing to engage in an inconvenient forum analysis under Code of Civil Procedure section 410.30. Manickam did not present these arguments to the trial court, so he has forfeited them for purposes of appeal. (See *In re Marriage of Brewster & Clevenger* (2020) 45 Cal.App.5th 481, 510; *In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 695.)

In any event, no party raised section 2660 in the trial court, and the court did not rely on any statute in ordering a stay. The court apparently relied on its inherent power to control the proceedings before it. " '[A] court ordinarily has inherent power, in its discretion, to stay proceedings when such a stay will accommodate the ends of justice.' [Citation.] As the court in *Landis v. North American Co.* (1936) 299 U.S. 248, 254, explained, 'the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.' " (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 141; accord, *Freiberg v. City of Mission Viejo* (1995) 33 Cal.App.4th 1484, 1489 ["Trial courts generally have the inherent power to stay proceedings in the interests of justice and to promote judicial efficiency."].)

Manickam has not shown that the court did not have the inherent power to order the stay or that it abused its discretion in doing so. By focusing on what statute might authorize the stay, Manickam does not address whether the stay order was reasonable under the circumstances. Our review of the record shows that the trial court had a reasonable basis to conclude that a stay would promote judicial efficiency. The couple's

ownership interest in several of the Indian properties was the subject of an ongoing proceeding involving the couple and third parties in the Indian courts.  While apparently primarily a lawsuit for damages, the proceeding would necessarily involve consideration of the nature and origin of the current record title to the properties (and it may indeed affect such title). Section 2660 instructs the trial court, to the extent possible, to preserve the record title (or other interest) for such non-California properties to minimize the practical difficulties of dividing the couple's community property.  And, more generally, the trial court's consideration of the Indian properties and related credit and reimbursement issues would be informed by the Indian proceeding and its outcome.  Manickam has not shown it was unreasonable for the trial court to determine that it would be more efficient to await the outcome of the Indian proceeding to consider whether and to what extent the California courts would be required to address the couple's interests in the Indian properties, and to take into account that outcome in fashioning any relief.  Indeed, although the record is somewhat unclear, it appears

23

Manickam's counsel agreed with the court that a stay was appropriate when it was imposed.[6]

## IV

### *Denial of a Continuance*

Manickam contends, without any citations to the record, that the court erred by denying his request for a continuance during trial to allow the accountants to "redo the reports based on documentation that he had provided." We review the court's decision to grant or deny a continuance for abuse of discretion. (*Thurman v. Bayshore Transit Management, Inc.* (2012) 203 Cal.App.4th 1112, 1126 (*Thurman*).) To the extent Manickam has not forfeited the issue, he has not shown the court abused its discretion.

"Trial continuances are disfavored and may be granted only on an affirmative showing of good cause." (*Thurman, supra*, 203 Cal.App.4th at p. 1127.) The trial court could reasonably find that Manickam had not established good cause for a continuance. Manickam already had the

---

[6] Manickam's reply brief opens with the assertion that Halagatti's respondent's brief did not address his "most important" claim of error, i.e., that "the trial court failed to make sure that all parties followed its order relating to the jurisdictional stay and failed to follow its own order by making sure that the report of [Halagatti's accountant] did not include the money transfers relating to the India property." Manickam, however, did not include any argument or authority in support of this claim of error in his opening brief. He included this alleged error and several related errors in his list of legal issues, but he never adequately supported them with cogent legal argument or authority. (See part II, *ante*.) Manickam therefore waived any claim of error for purposes of this appeal (see *Benach, supra*, 149 Cal.App.4th at p. 852), and we decline to consider arguments raised for the first time on reply (see *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4). "An appellant cannot salvage a forfeited argument by belatedly addressing the argument in its reply brief." (*SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 573, fn. 18.)

opportunity to retain his own accounting expert and engage with Halagatti's expert. The court did not prevent Manickam from offering his own expert testimony at trial. Manickam requested a "redo" of something that he already had the opportunity to do before trial.

The basis for Manickam's request, according to his opening brief, was "that the court was not going to permit [Manickam] to submit key financial documents that tended to correct [Halagatti's accountant's] conclusions . . . ." Manickam does not describe the specific documents at issue, explain why the court did not admit the documents, or show why the court's refusal to do so established good cause for a continuance. As such, his claim that the court's actions were a "significant, unanticipated change in the status of the case as a result of which the case [was] not ready for trial" is unsupported. (Cal. Rules of Court, rule 3.1332(c)(7).) Moreover, it appears that Manickam was unable to offer many of the documents into evidence because they were hearsay or because they were not timely provided to Halagatti's counsel. The trial court could reasonably find that Manickam's failure to comply with the Evidence Code or the Rules of Court—and his failure to offer the testimony of an expert accountant despite the opportunity to do so—did not constitute good cause for a continuance. Finally, Manickam's request for a continuance was made during trial, after extensive trial preparation, and after the court had already heard most of the testimony, including from Halagatti's retained

25

accounting expert. It was within the court's discretion to deny Manickam's request.[7]

V

*Pressure to Conclude*

Manickam next contends, again without any citations to the record, that the trial court "rush[ed]" his testimony and violated his due process right to present evidence. We review the constitutional issue de novo. (*Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 609-610.) We note initially that Manickam did not object in the trial court to "rushing" or other alleged time pressures. It therefore appears that Manickam has forfeited this issue on appeal. (See *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1; *In re Michael R.* (2006) 137 Cal.App.4th 126, 145.) Even assuming Manickam has not forfeited this issue—either by failing to object in the trial court or by failing to adequately brief the issue in this court—he has not shown the court erred.

Manickam relies on *In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 292, which held that a trial court violated due process by, among other things, "abruptly end[ing] the trial in the middle of a witness's testimony, prior to the completion of one side's case and without giving the parties the opportunity to introduce or even propose additional evidence." Other than referencing "rushing," without any specific examples, Manickam does not

---

7    Manickam asserts, "The record suggests that [the] court did not adequately consider the prejudice that [Manickam] would suffer as a result of the requested delay." The meaning of this assertion is somewhat unclear, since Manickam was the party requesting the delay. Assuming that Manickam is attempting to assert that the court did not adequately consider the prejudice that Manickam would suffer by *not* granting the requested delay, we find such an assertion unsupported and unpersuasive for the same reasons we have discussed regarding good cause.

26

explain what the trial court did that allegedly violated his due process rights. Our review of the record shows that the trial court gave Manickam the opportunity to present testimony and evidence and Manickam did so. Manickam estimated that he would only need "[f]ive minutes" to present his direct testimony, and the court allowed him to significantly exceed that estimate. At the conclusion of Manickam's testimony, after he said he was finished, the court offered Manickam the opportunity to present more evidence when it appeared he wanted to cover additional documents. Manickam declined.

In his briefing, Manickam appears to take the position that the court allocated two days for the trial but decided on the trial date to limit testimony to one day. As noted (see fn. 3, *ante*), the record provided by Halagatti shows that the court anticipated that the remaining issues would only take one day, not two, and informed the parties of that schedule in a minute order. In any event, Manickam has not offered any cogent legal argument that the court erred by limiting trial to one day or that he was prejudiced by such a limit.

To the extent Manickam contends the court erred by sustaining objections to specific evidence, he has not identified any particular piece of evidence or cogently explained how the court erred by excluding it. Moreover, he has not shown prejudice. As explained by the other authority Manickam cites, "The erroneous denial of some but not all evidence relating to a claim [citations] differs from the erroneous denial of all evidence relating to a claim, or essential expert testimony without which a claim cannot be proven [citations]. In the former situation, the appellant must show actual prejudice; in the latter situation, the error is reversible per se." (*Gordon v.*

*Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1115.)  Here, Manickam has established neither error nor prejudice.[8]

## DISPOSITION

The order is affirmed.  Halagatti is entitled to her costs on appeal.


GUERRERO, J.

WE CONCUR:



BENKE, Acting P. J.



O'ROURKE, J.

---

[8]     Because we conclude the order should be affirmed, we need not consider the various alternative arguments offered by Halagatti in favor of affirmance.  Halagatti also requests an award of appellate attorney fees under section 271.  She should make such a request to the trial court in the first instance.  (See *In re Marriage of James & Christine C.* (2008) 158 Cal.App.4th 1261, 1277-1278.)  We express no opinion on its merits.